[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The instant proceeding was generated by the denial of a claim filed by Mama Nolan (hereinafter "Nolan") against the Estate of Guy L. Colson (hereinafter "the decedent") which was denied by the then defendants, Anna Rae Willard and Joyce F. Blinstrubas, each of whom at the time was a co-executrix of that estate.[1] Colson was Nolan's maternal uncle. The familial relationship between Nolan and the decedent apparently was recognized sometime in 1974, when the decedent, who was then approximately seventy-one (71) years of age, arrived at Nolan's home, unrecognized, unknown and uninvited.[2] The familial relationship between them was nominal at best before becoming what might well be termed nearly "servile."
After he identified himself as her uncle, he indicated that he wanted her to go to an anniversary Mass. being offered for her mother's soul, that his sisters intended to attend; and that he believed that she might desire to be present as well. As time progressed, he began to be an irregular, unannounced, but consistent visitor to Nolan's home. Initially, it seems that he would journey to New Hampshire to pay his automobile insurance and that the Nolan home was the approximate midpoint between his New York City residence and New Hampshire. Again, as time passed, the visits became longer, and he would arrive approximately once a month and stay one or two days. However, there was one occasion when he stayed for six (6) weeks. Nolan never knew when he would arrive for one of his visits. When he did arrive, she and her family did whatever they could to accommodate him. He'd be given nearly exclusive use of the children's TV and what appeared to be the family room, he was fed with the family, and he was given her ten (10) year old son's bedroom. When using that room, her son slept on the floor in her bedroom.
As these visits progressed, the decedent, with increasing frequency, began to discuss with her the possibility of him moving to Connecticut from New York. He expressed a concern over the fact that he was growing CT Page 15797 older and inquired that if he did move to Connecticut, would she help him in order to avoid being confined to a nursing home. This possibility was a substantial worry for him, and he finally asked if she would take care of him as he progressed through the aging process.
During these discussions, he said that she would be well provided for in his will, that she would never have to work again, and she would be financially secure for the rest of her life. In a sense, he was a man of mystery who accumulated substantial wealth, was reputed to have been affiliated with the CIA, and was a retired army major said to have been wounded in Korea. At one point, he showed her a will in which she was named as the executrix. He told her that in addition to whatever he left her, he would pay her a fee as his executrix of ten (10) percent of his entire estate. These statements were repeated to her then husband, and the content of said statements was common knowledge among the family members. Nolan admittedly relied on these statements as she ministered to his needs, both real and imaginary.
She assisted him in finding an apartment in Carlton Towers in Waterbury. She swept, vacuumed and cleaned the apartment; she did his laundry, she cared for his dry cleaning, and changed his bed. At that time, she was regularly employed at the Waterbury post office and, occasionally, as a bus driver. She provided him with several meals a week and with the passage of time, the meals became much more frequent. He demanded certain foods from her and she would often pay for them without reimbursement.
In the beginning, he was able to drive by himself but she always did all his housekeeping. She would bring his meals to him during her lunch break at the post office. In addition, she would buy certain items of clothing for him such as slippers, bringing several pairs home for him to make a choice and, subsequently, return them.
With the passage of time, he fractured his hip on two occasions and was confined to a convalescent hospital. Immediately before each discharge, she was required to sign a document accepting responsibility for his care as he convalesced. During his confinements to the nursing home after surgery on his hip, she did not prepare meals for him. She did, however, take home his laundry and wash it as he didn't care to have it mixed with nursing home laundry. As well as bringing him his mail, she wrote out his checks and paid his bills. Upon returning to his home after her signature on the responsibility documents, his demands and his needs were at least tripled from what they had been. She had been making virtually all of his meals and, ultimately, began to bathe him, dress him and minister to his personal hygiene. She gave him enemas and cleaned him when he would CT Page 15798 defecate. She supervised his medications, including pills, and was virtually on call twenty-four hours a day.
Again, as time passed, the mileage on her own automobile reached approximately two hundred thousand (200,000) miles. He told her he was going to purchase a new car and it would be her car, insisted that she see it, choose the colors, the upholstery, and test drive it. It was a 1998 Audi, which, after a purchase in cash, was parked in the parking lot at Carlton Towers until the time of his death and was then bequeathed to his aged and infirm sister and not to Nolan. Very consistently, over this time period, he reiterated his promises to pay her ten (10) percent of his estate for her services as executrix and to provide for her in his will so that she would never have to work again and that her future would be comfortable from a financial point of view and enjoyable.
When he died, much to her surprise and chagrin, she discovered that a new will had been drawn, that she was not named the executrix, and that she was not left the bulk of his estate. She was, however, bequeathed the sum of twenty-five thousand ($25,000) dollars, and her present husband and children were all left the sum of five thousand ($5000) dollars. Upon the realization of what had happened, she consulted counsel; and her claim against his estate, which is the subject of this memorandum, was prepared and filed.
The claim she submitted is the product of her memory and priced at what she believes the reasonable value of those services to be. That value, as she expressed it, was "itemized" as follows:
1986-1993 8,320 hours 1994-June, 1999 7,800 hours
Total Hours 16,120
The total of those hours, sixteen thousand one hundred twenty (16,120), calculated at eighteen ($18) dollars per hour, by virtue of inquiry of service providers, yields a figure of two hundred ninety thousand one hundred sixty ($290,160) dollars. In addition thereto, she claimed reimbursement for food expenditures:
1986-1993 $12,480 1994-June, 1999 $13,000
The total expenditure for food for which she claims reimbursement is twenty-five thousand four hundred eighty ($25,480) dollars. The aggregate of those itemizations is three hundred fifteen thousand six hundred forty CT Page 15799 ($315,640) dollars. The value of the decedent's estate changed from September 25, 1999, when that value was expressed as one million five hundred eighty-three thousand two hundred eighty-four dollars and eighty-seven cents ($1,583,284.87) to one million seven hundred seven thousand one hundred fifty-seven dollars and seventy-three cents ($1,707,157.73) as of June 30, 2002. The approved distribution to the specific legatees under the will was six hundred seventeen thousand one hundred sixty-six dollars and twenty-two cents ($617,166.22), which provides a balance on hand as of June 30, 2002 of one million six thousand five hundred forty-six dollars and sixty-three cents ($1,006,546.63).
The date of the decedent's death was June 20, 1999. His will was admitted to probate on or about June 24, 1999. Nolan submitted her claim to the fiduciaries of the estate on October 1, 1999; and on October 15, 1999, the claim was denied by those fiduciaries.
On September 22, 1999, Nolan filed a Chapter 7 bankruptcy on the advice of an attorney.[3] At the time she filed her voluntary petition in bankruptcy, she was well aware that she was a beneficiary under the decedent's will. She did not disclose in her petition that she was such a beneficiary or of the existence of her claim for services. The defense urges that her failing to disclose the existence of her contractual claim on her petition can only lead to one of two conclusions. The first of these is that she had no such agreement of compensation with the decedent or, secondly, that she had purposely concealed the same from the bankruptcy court. This, the defendant claims, gives rise to the defense of Unclean Hands.
It has been held that the burden of proof in will contests generally is that of a fair preponderance of all of the evidence. Lockwood v.Lockwood, 80 Conn. 513, 520-21 (1908). However, the burden of proof in cases of undue influence is clear and convincing evidence. This becomes a bit confusing, however, when the cases continue to cite to Lockwood. SeeHills v. Hart, 88 Conn. 394-97 (1914) and the appeal of Bates v.Wheeler, 109 Conn. 733 (1929). Clearly, this is a claim for reimbursement against the decedent's estate and, as such, this court is convinced that the proper standard with respect to the burden of proof is indeed clear and convincing evidence. Hull v. Thoms, 82 Conn. 647 (1910); Appleby v.Noble, 101 Conn. 54 (1924). There is a presumption that services rendered to a family member by another family member are rendered gratuitously without the expectation of payment. Hoskins v. Saunders, 80 Conn. 19
(1907). "Familial" here could well be considered a misnomer. The court finds that here the presumption has been overcome. In order to sustain a claim based on an oral agreement to compensate for services through a will, the plaintiff must prove by clear and satisfactory proof that there CT Page 15800 was a mutual understanding or agreement. Ubysz v. DiPietro, 185 Conn. 47,58 (1981).[4]
To reiterate, the decedent's representatives assert that the defense of Unclean Hands under the authority of Sec. 52-1 of the General Statutes is available in this case. The thrust of that defense arises out of the filing of the petition in bankruptcy. The claim of substantiation therefor is that she alone filed the petition to the exclusion of her spouse; there was only one lawsuit pending against her dating back to 1997 which was the result of an automobile accident; her home mortgage was current and not in default; there were no actual or threatened attachments or liens; and two years prior to that filing, she earned over fifty thousand ($50,000) dollars. To prevail on that doctrine, the conduct under scrutiny formerly had to arise as the result of actions of the parties which establish an express contract. Currently, our Supreme Court has expanded the doctrine in situations where one has committed fraud. The filing of the petition in bankruptcy herein is claimed to be an example of fraud.
True it is that she retained one attorney to file the petition without advising him of her inheritance and of the very substantial claim which she intended to file against her uncle's estate. At virtually the same time, another attorney was retained to present the claim to the fiduciaries of the estate. However, she failed to tell him that she was proposing to file a petition in bankruptcy. While not set forth in the original petition, the trustee permitted her to file an amended Schedule B to her Chapter 7 petition. The trustee advised the court that it was his duty to the creditors of the bankrupt's estate to maximize the assets of the estate available to satisfy their claims. It might well enhance his fee as the trustee as well. His alternatives, had he believed that fraud was committed in addition to referring it to the bankruptcy judge, would be to move for dismissal of the petition or to file a complaint with the state's attorney having jurisdiction. He did nothing but, apparently, accepted her actions as an honest mistake.
The water has become further muddied upon the disclosure that the trustee has become counsel to the law firm representing the plaintiff. It does not require any particular exercise of law or logic to recognize that negotiations for that affiliation were probably in progress while the bankruptcy was pending. Upon consideration of all of the evidence and the arguments of counsel, this court is constrained to note that the plaintiff's actions do not satisfy the basic requisites of the doctrine of Unclean Hands.[5] In addition, the decedent falls far short of satisfying the burden of proof of fraud. That burden is not unlike the burden of proof in will contests.[6] "The party claiming fraud must CT Page 15801 satisfy a standard of proof more exacting than the preponderance standard generally applicable in civil cases. Alaimo v. Royer, 188 Conn. 36, 39,448 A.2d 207 (1982). In attempting to define this elevated standard, our decisions have used such phrases as `clear and satisfactory evidence';Miller v. Appleby, 183 Conn. 51, 55 438 A.2d 811 (1981); `clear, precise and unequivocal evidence'; DeLuca v. C.W. Blakeslee Sons, Inc.,174 Conn. 535, 546, 391 A.2d 170 (1978); and `clear, convincing and unequivocal evidence'; Dunham v. Dunham, 204 Conn. 303, 322 528 A.2d 1123
(1987)." Pinder v. Pinder, 42 Conn. App. 254, 263 (1996). Accordingly, the factual predicate for this defense cannot be found to be meritorious.
In an action at law based upon a contract, the party seeking recovery has the burden of proving by a fair preponderance of the evidence the amount of his damages. The court must have evidence by which it may calculate the damages which are not merely subjective nor speculative but which allow for some objective ascertainment of the amount. Bronson Townsend Co. v. Battistoni, 167 Conn. 321, 326-7 (1974). In the ordinary contract action, the court determines the just damages from the evidence. Fuessenich v. DiNardo, 195 Conn. 144, 148-53 (1985).
To reiterate, in order to sustain a claim based on oral agreements to compensate for services through a will, the plaintiff must prove by clear and satisfactory proof that there was a mutual understanding or agreement. Ubysz v. DiPietro, supra. Since the early 1900s, our Supreme Court has consistently maintained the presumption that services provided by one family member to another are gratuitously rendered without the expectation for payment. Hoskins v. Saunders, 80 Conn. 19, 22 (1907);Cotter v. Cotter, 82 Conn. 331-32 (1909); Downey v. Guilfoile,96 Conn. 383, 386 (1921); Perkins v. Corkey, 147 Conn. 248, 250 (1960).
Claims based on an alleged oral agreement to compensate the services of a family member through a bequest or devise in a will pose at least two difficulties for our courts. First, there is a potential that a living plaintiff may take advantage of the absence of the deceased promissor to press a false claim. Taylor v. Corkey, supra; Graybill v. Plant,138 Conn. 397, 400 (1951). Secondly, such cases can result in a mischaracterization of the nature of the alleged promise or agreement. A distinction must be drawn between expressions denoting an intention to give and those intending an obligation to pay. Many statements mistakenly relied upon by claimants as creating an obligation to compensate by will are nothing more than statements by the deceased denoting an intent to give of his bounty. Wilhelm Settlement of Estates (R. Ed. 1974), Section 241, 353-4. CT Page 15802
In addressing the first of the two "difficulties," Nolan testified that he told her that "I could believe him"; that he had a lot of money plus whatever else he decided to give her; that he had made a lot of demands upon her time already, and then when he died, she would never have to worry about money again, she'd be able to retire and enjoy her life. These declarations, for the most part, the court finds to be nothing more than the statements by a decedent denoting an intent to give of his bounty. The court is also troubled by the rate of compensation at eighteen ($18) dollars per hour as the result of inquiries made to various agencies and/or entities by her attorney. No less troublesome is the number of hours calculated at sixteen thousand one hundred twenty (16,120). A product of the hours and the rate produces the figure of two hundred ninety thousand one hundred sixty ($290,160) dollars. No matter how one analyzes this claim, the number of hours and the amount of compensation legally and logically yield a conclusion the evidence is substantially less than clear and convincing and in fact is speculative.
However, the claim of payment to the plaintiff in her capacity as executrix under his will is much less troubling. The decedent actually showed the plaintiff his will drawn at the time in which she was indeed named as the executrix and promised to pay her an executrix fee of ten (10%) percent of his estate.[7]
This declaration, together with the document exhibited to Nolan by the decedent, is found by this court to be a contract and may be recognized as the intent of the decedent to pay such a sum for her to serve in such a capacity. It is further found that the plaintiff in rendering these services rendered them in exchange for and reliance upon that promise. That being the case, the court finds the plaintiff is indeed entitled to ten (10%) percent of the value of his estate which, upon probate, was valued at one million five hundred eighty-three thousand two hundred eighty-four dollars and eighty-seven cents ($1,583,284.87). Mathematically, the award becomes one hundred fifty-eight thousand three hundred twenty-eight dollars and forty-nine cents ($158,328.49). From that sum the court subtracted the actual gift left to the plaintiff of twenty-five thousand ($25,000) dollars, for a total award of one hundred thirty-three thousand three hundred twenty-eight dollars and forty-nine cents ($133,328.49).
The defense has, in addition to the defense of Unclean Hands, alleged a statute of limitations defense. No evidence thereof was offered and it was not briefed. Consequently, this court treats it as abandoned. SeeFerrara v. Hospital of St. Raphael, 54 Conn. App. 345, 351 (1999);Sandvig v. A. Dubreuil and Sons, Inc., 68 Conn. App. 79, 96 (2002);Emerick v. Kuhn, 52 Conn. App. 724, 744 n. 16 (1999); Thames RiverCT Page 15803Recycling v. Gallo, 50 Conn. App. 767, 780 n. 9 (1998).
It is also significant to note that the testimony of the plaintiff and her witnesses, that the testimony of most, was cumulative hearsay; however, she and her present husband were found by this court to indeed be highly credible.
Judgment may enter in accordance with the foregoing.
 ___________________ Moraghan, J.T.R.